# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| **RIOLORDO APPLING,** | Court Of Appeal NO.: |
| | 15-55732 |
| | D.C. NO.: 2:13-cv-08891-JAK-AJW |
| **Plaintiff-Plaintiff,** | |
| **vs.** | |
| **CITY OF LOS ANGELES, SUE BRANDSTETTER, TIMO ILLIG, THOMAS SMALL** | |
| **Appellee-Defendant.** | |

**ON APPEAL FROM A JUDGMENT
OF THE SUPERIOR COURT, COUNTY OF LOS ANGELES
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HON. JOHN A. KRONSTADT, JUDGE**

**PLAINTIFF'S OPENING BRIEF**

Matthew Rabban, State Bar No. 277910

LAW OFFICE OF MATTHEW

RABBAN 401 Wilshire Blvd, 12th Floor, Penthouse

Santa Monica, California 90401

Tel. (818) 448-5625 Fax. (424) 645-1180

**TABLE OF CONTENTS**

                                                                    **Page**

TABLE OF CONTENTS                                                    iii

TABLE OF AUTHORITIES                                                 v

JURISDICTIONAL STATEMENT                                             1

STATEMENT OF THE ISSUES                                              1

STATEMENT OF THE CASE                                               1

STATEMENT OF APPEALABILITY                                           2
STATEMENT OF FACTS                                                   2

SUMMARY OF ARGUMENT                                                  17

ARGUMENT                                                             13


    **i.** **Plaintiff was prosecuted and charged without probable cause through a combination of using unreliable identification procedures, tainting witness recollections, by judicially deceiving prosecutors, as well as subjecting Plaintiff to procedures that made it all but inevitable that witnesses would identify Plaintiff whether or not he was in fact "the man"** …………………………………13

    **ii.** **There is substantial evidence that Brandstetter conducted judicial deception on prosecutors.** …………………………20

    **iii.** **Plaintiff's right to exculpatory evidence under Brady was violated**…………………………………………………… 22

**iv.**     **Defendants were aware of Plaintiff's innocence many days before actually exonerated……………………………………..23**

**v.**     **Plaintiff was maliciously prosecuted by Defendants…………23**

**vi.**     **Defendants deliberately fabricated evidence against Plaintiff.24**

**vii.**     **City is liable under Monell……………………………………..25**

**viii.**     **Defendants violated the Equal Protection Clause…………….28**

**ix.**     **Conspiracy by defents……………………………………………29**

**x.**     **Plaintiff's right to liberty was deprived without due process of law…………………………………………………………………..30**

**xi.**     **Qualified immunity does not apply……………………………32**

**xii.**     **Plaintiff proved his innocence…………………………………33**

**xiii.**     **Court should reverse granting of summary judgment……….35**

**xiv.**     **Jury instructions – advisory opinion…………………………36**

CONCLUSION                      36

CERTIFICATE OF COMPLIANCE       38

STATEMNT OF RELATED CASES       39

CERTIFICATE OF SERVICE          40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Allen v. McCurry</u> 445 U.S. 90, 103, 101 S.Ct. 411, 66 L.Ed. 308 .............. 36

<u>Anderson v. Creighton 483 U.S. 635, 641)</u> .................................................. 34

<u>Anderson v. Liberty Lobby, </u>Inc. 477 U.S. 242, 255, 107 S. Ct. 3034, 97 L.
Ed. 2d 523 ............................................................................................... 37

<u>Baker v. McCollan</u> 443 US 137, 147, 99 S. Ct. 2689, 61 L. Ed. 2d 433 ..... 31

<u>Barr v. Matteo</u> 360 US 564 (1959) ............................................................... 37

<u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S.Ct. 223, 13 .................................... 15, 33

<u>Bell v. Hood Bell v. Hood </u>327 U.S. 678 at 685 (1946).
……………………34

<u>Billington v. Smith</u>, 292 F. 3d 1177 (9th Cir. 2002) ..................................... 37

<u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403, US 388, 389 (1971) . 36

<u>Bretz v. Kelman</u>, 773 F.2d 1026, 1029 (9th Cir. 1985) ................................ 30

<u>Carey v. Piphus</u> 435 U.S. 247, 259, 98 S. Ct. 1042, 55 L. Ed. 2d 252......... 27

<u>City of Canton v. Harris</u> 489 U.S. 378, 385 ................................................ 25

<u>Devereaux v. Abbey</u>, 263 F.3d 1070 (9th Cir. 2001) .................................... 24

<u>Ewing v. City of Stockton</u> 588 F.3d 1218, par.3 (9th Cir. 2009)…….……..20

Fed. Deposit Ins. Corp. v. Henderson 940 F.2d 465, 471 (9th Cir. 1991) .... 29

Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402.......... 30

Gantt v. City of Los Angeles, 717 F.3d 702, 707 (9th Cir. 2013)................ 24

Grant v. City of Long Beach 315 F.3d 1081, .............................................. 15

Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 ......... 35

Llaguno v. Mingey 763 F.2d 1560 ............................................................... 38

Malley v. Briggs 475 U.S. 335 at 346 (1986)……………………….……….32

Manson v. Brathewaite, 432 U.S. 98,114, 97 S.Ct.2243, 53 L.Ed.2d 140

(1977) ...................................................................................................... 18

Mathews v. Eldridge 424 U.S. 319 at 344 (1976)

Marbury v. Madison, 1 Cranch 137, 163 (1803) .......................................... 37

Nonnette v. Small, 316 F.3d 872, 875 (9th Cir. 2002) .................................. 35

Owen v. City of Independence 445 U.S. 622, 653 (1980), 100 S.Ct. 1398, 63

L.Ed. 2d 673 ........................................................................................... 27

Peirce v. Multnomah County, Oregon 76 F.3d 1032, 1038-39 (9th Cir. 1996)

..................................................................................................... 34

Sever v. Alaska Pulp Corp., 978 F.2d 1529, 536 (9th Cir. 1992).................. 29

Simmons v United States 390 U.S. 377, 383 (1968).............................. 16,31

Solomon v. Smith, 645 F.2d 1179, 1186 (2nd Cir. 1981 ............................... 19

Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 l.Ed. 2d 286 (1999) ........................................................................................ 22

Under Act Up/Portland v. Bagley, 988 F.2d, 868, 873 (9th Cir. 1993) ........ 37

United States v. Sanchez, 24 F.3d 1259, ..................................................... 17

United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994) .................. 17

United States v. Wade 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ...................................................................................................... 16

Wiley v. Sinkler 179 U.S 58 (1990) ............................................................. 36

Youngblood v. West Virgina, 547 U.S. 867, 869,126 S. Ct. 2188, 165 L. Ed. 269 (2006) ................................................................................................ 22

**Statutes**

**42 U.S.C. §1985 (3)**.............................................................................. 29, 32

**Constitutional Provisions**

U.S. CONST. amend.XIV, §1 ....................................................................... 28

Civil Rights Act of 1871 (42 USC §1983)…………………………………1

## JURISDICTIONAL STATEMENT

This is an appeal from a court's final judgment in a civil case. The court had jurisdiction under 18. U.S.C 3231. The court entered a final judgment against Plaintiff on April 16, 2015. Plaintiff timely filed a notice of appeal on date here May 13, 2015. (ER-002)[1].  This Court has jurisdiction under 28 U.S.C 1291.

## STATEMENT OF THE ISSUES

Whether Plaintiff has a right to trial for damages after he was falsely imprisoned for eleven months, as a result of numerous violations of Plaintiff's constitutional rights.

## STATEMENT OF THE CASE

Riolordo Plaintiff (hereinafter "Plaintiff") is an innocent man who was wrongfully incarcerated for approximately eleven months until exonerated. Plaintiff proved his innocence. Following Plaintiff's release, Plaintiff filed suit under the Civil Rights Act of 1871 (42 USC §1983) for an array of constitutional violations which caused Plaintiff to be wrongfully incarcerated. Numerous constitutional rights were violated by Defendants Detective Brandstetter ("Brandstetter"), Detective Illig ("Illig"), and Detective Small ("Small") and the City of Los Angeles (altogether referred to as "Defendants").

The district court granted Appellees' motion for summary judgment

---

[1] "ER" refers to Plaintiff's Excerpts of Record, filed simultaneously with this brief.

as the district court incorrectly decided that Plaintiff's constitutional rights have not been violated. (DR Doc. 91 p. 22 line 6-9, ER-025).

Plaintiff's suit is a statutory right. The Federal Civil Rights Act of 1871 (42 USC §1983) reads that "Every person who, under of any statute, ordinance, custom, or usage, of any State or Territory, or causes to be subjected, any citizen of the United States … the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured …" For the reasons outlined, Plaintiff's constitutional rights were violated, Defendants s are potentially liable to Plaintiff in tort, and Plaintiff has a right to have the case decided by his peers.

## Statement of Appealability.

This appeal is from a final judgment after an order granting summary judgment to Defendants on all causes of action. The trial court entered final judgment on April 16, 2015. Plaintiff timely filed a notice of appeal on May 13, 2015. (ER-p.2).

## Facts

The following facts have led to numerous tragedies including severe bodily injuries, an innocent person being falsely jailed, and a real criminal who remains on the loose. On June 1, 2009 a melee involving at least a

dozen people broke out in the parking lot of the Opera Nightclub in Hollywood over a car parked too close. (DR DKT 56-5, Page 2, ER-p.131). On one side of the melee was several men, mostly black and "mixed" as well as a Hispanic female.(DR Dkt. 46-1 p. 3, #9, ER-p.109). On the other side of the melee involved Michael Weaver ("M. Weaver"), his sister Danyelle Weaver (D. Weaver), and friends Amanda Moore ("Moore"), Tommy Clayton ("Clayton"), and Charlie Jacquo ("Jacquo"), known as the Weaver group. (DR Dkt. 46-1 p. 2, #3, ER-p.108). The Weaver group had been drinking alcohol with an alcohol tab of approximately $1,500.00. (DR Dkt. 56-6, ER-p.83). Before the nightclub, the Weaver group was at a comedy show where they also drank liquor. (ER-p.82). At around 1:45 A.M. the Weaver group exited the nightclub and made their way toward D. Weaver's vehicle which was in the parking lot across the street. (DR Dkt. 46-1 p. 2, #3, ER-p.108). Clayton stayed behind to talk to a woman. (DR Dkt. 46-1 p. 2, #3, ER-p.108). Moore stopped at the front of the parking lot for Clayton while the others continued walking to their vehicle, a BMW. (DR Dkt. 46-1 p. 2, #3, ER-p.108).

D. Weaver attempted to enter her BMW but another BMW was parked too close. (DR Dkt. 46-1 p. 2, #4, ER-p.108). The BMW owner was with a group of black and "mixed" males and there were 15-20 people

involved in the situation. (DR Dkt. 56-6, ER-p.83). In the passenger seat of the other BMW was a woman described as a short Hispanic female in a turquoise dress ("female suspect") (DR Dkt. 56-5 p. 2, ER-p.131). Note that Jacquo was apparently the only one not intoxicated and was likely the most valuable witness. (DR Dkt. 56-5, ER-p.131). Jacquo asked the driver of a BMW to move his car. (DR Dkt. 56-5 p. 2, ER-p.131). The driver assailant was described as a short, skinny, dark skinned black male with a slender nose and squinty eyes. (DR Dkt. 56-5 p. 2, ER-p.130; DR Dkt. 56-4, ER-p.041; DR Dkt.56-3, ER-p.73). The male assailant began yelling and threatened to hit the females. (DR Dkt. 46-1 p.3 #8, ER-p.109).

D. Weaver managed to enter her vehicle when three to six men who were with the assailant driver began punching M. Weaver. (DR Dkt. 46-1 p. 3 #9, ER-p.109). D. Weaver got out of her vehicle and jumped on the suspects. (DR Dkt. 46-1 p. 3 #9, ER-p.109). The female suspect began fighting D. Weaver. (DR Dkt. 46-1 p. 3 #9, ER-p.109). D. Weaver called for help from Clayton. (DR Dkt. 46-1 p. 3 #11, ER-p.109). The suspect punched Moore in the face and knocked her unconscious. (DR Dkt. 56-3 p. 12, top 4 lines, ER-p.53). Next, Clayton began fighting with the group knocking a few down. (DR Dkt. 46-1 p. 3 #9, ER-p.109). In the meantime M. Weaver was knocked down and was unconscious. (DR Dkt. 46-1 p. 3 #10, ER-p.110).

At around this time the male and female suspect entered their BMW and nightclub bouncers Marvin Hamlin ("Hamlin") and Thomas Murray ("Murray") attempted to stop the BMW. (DR Dkt. 56-5 p. 4, ER-p.133). Hamlin approached the vehicle and opened the driver's side door. (DR Dkt. 56-5 p. 4, ER-p.133). The suspect reversed striking Murray and causing Murray to spin around and break the driver's side window, which fell to the floor. (DR Dkt. 56-5 p. 4, ER-p.133). Hamlin stopped pursuing the suspect and attended to Murray (DR Dkt. 46-1 p. 5 #1, ER-p.111). The male suspect then drove the BMW over M. Weaver causing severe injury. (DR Dkt. 56-5 p. 4, ER-p.133). The vehicle fled (DR Dkt. 56-5 p. 4, ER-p.133).

The suspect's BMW was described differently with respect to whether it was a two or four door, whether it was white or silver, and whether it was a 3 series or 6 series BMW. (DR Dkt. 56-5 p. 2, ER-p.131; DR Dkt. 56-3 p. 33, ER-p.74; DR Dkt. 56-4, ER-p.42; DR Dkt.56-5, ER-p.146). The license plate was said to start with a 6. (DR Dkt 46-1, #20, ER-p.111; DR Dkt. 56-4, p. 2, ER-p.033).

LAPD Detectives Brandstetter, Small, and Illig were assigned to investigate these incidents - Brandstetter was lead detective. (DR Dkt. 46-1 p. 7, lines 20-21, ER-p.113). Brandstetter interviewed Murray on June 1, 2009 - Murray stated that the female suspect was a regular but that he did

not know her name. (DR Dkt. 46-1 p. 5, #23, ER-p.111). Murray directed Brandstetter to Opera's General Manager Yoshi Fujimoto ("Fujimoto"). Fujimoto stated that the female suspect might be a girl named Jennifer Williams ("Williams") who used to work at Hooters. Brandstetter was able to get Williams' driver's license number from Hooters. (DR Dkt. 46-1 p. 5, #1, ER-p.112).

Thereafter, Williams was placed in a six-pack lineup ("six-pack A") and placed in the #4 position and was identified by D. Weaver, Jacquo, and Murray while Clayton picked a multiple photos. (DR Dkt. 46-1, ER-p.112). Witnesses were shown a photograph of a 2009 BMW 3 Series with a sunroof and witnesses agreed that it looked similar to vehicle used in the crime. (DR Dkt. 56-4, p. 15, ER-p.35). Around this time detectives attempted to obtain video footage from the area and find parking lot witnesses but were unsuccessful at the moment. (DR Dkt. 46-1, #33 &34, ER-p. 113).

It took detectives almost one year to find Williams when she was interviewed by Small on May 4, 2010 . (DR Dkt. 46-1, #37, ER-p.113). Williams repeatedly denied being involved in anything criminal. (Id at #38, ER-p.114). Thereafter, Small began telling Williams to "stop playing games" and to state who she knows that is black in order to force Williams

to state a name. (DR Dkt.56-6, ER-p.94). Being forced to state a black friend, Williams named Plaintiff, a friend. Id. After the conversation, Williams failed to cooperate and would hang up on the detectives or would tell them that she never said that Plaintiff was involved in any fight. Id.

Thereafter, Small researched Plaintiff and discovered that he received a traffic ticket in a white BMW hard top convertible with a license plate starting with the number 5. (DR Dkt. 46-1, p. 9, #45, ER-p.115). The car did not have a sunroof. That day, Plaintiff took his girlfriend's BMW to get lunch at Chipotle – that girlfriend's name was Jackie Martinez. The vehicle will be referred to as the "Martinez BMW".

Plaintiff did not match the physical description of the suspect. Plaintiff is 5 foot 11 inches, muscular, is not a "dark" black man, and doesn't quite have a slender nose. Plaintiff weighs 205 pounds. At this point, Plaintiff was subjected to an array of unduly suggestive procedures which resulted in misidentifications and further served to mislead witnesses into believing Plaintiff was "the man". Such problems include conducting lineups that are not blind, repeatedly exposing Plaintiff to witness as the criminal, utilizing lineup procedures when the indicia of reliability is strikingly low, causing Plaintiff to be the most clear photo, and causing Plaintiff to jump out, among other things.

The results of the Plaintiff six-pack were as follows. On May 5, 2010, Murray wrote that #4 in lineup B was "close to the guy I remember". (DR Dkt. 46-3, p. 2, ER-p.160). On May 6, 2010, D. Weaver did not recognize anyone (DR Dkt. 46-3, p. 4, ER-p.162). On May 6, 2010 Clayton wrote that "4 feels as if he was one of the gentlemen I got into the altercation with … 6 seems to look like the gentleman that punched Amanda." (DR Dkt. 46-3, p. 5, ER-p.163). On May 11, 2010 Moore writes that "#2 and #4 seem most familiar but that the height and statute was key as he was smaller frame. (DR Dkt. 46-3, p. 7, ER-p.165). On May 11, 2010 Hamlin identified #4 based on the "physical features in his face and the signature in his shoulders". (DR Dkt. 46-3, p. 9, ER-p.167).   On May 11, 2010 Jacquo wrote that she did not recognize anyone in the photos. (DR Dkt. 46-3, p. 11, ER-p.169). On May 13of 2010 M. Weaver wrote that "#6 looks familiar". (DR Dkt. 46-3, p. 12 ER-p.170).

Despite numerous problems with the procedure and procurement of the line-up, the detectives took the results and at their decision switched the entire investigation geared towards the prosecution of Plaintiff up until he was exonerated. (DR Dkt. 56-6, p. 28-29 (Brandstetter depo), ER-p.095).

On May 17, 2010 Small and Illig obtained consent to investigate the

Martinez BMW which was now owned by the Tobias family. (DR Dkt. 46-1, p.12 #66, ER-p.118). Detectives had other agents process the vehicle and found a fiber which detectives relayed to witnesses and prosecutors as evidence by way of a hair – the false evidence was used to taint witness recollections until the truth was reported on March 31, 2011. (DR Dkt. 46-5, p.7 ; DR Dkt. 46-5, p. 9, ER-p.154).

Detective Brandstetter presented prosecutors with summaries by way of progress reports. (DR Dkt. 56-6 p. 14-15 (DR Dkt.56-6, ER-p. 087-088). SID, Ex.3. 56-3, pg. 10-26, ER-p.051- 069). The "summaries" which Brandstetter states were "all" of the facts leave out substantially vital information and repeatedly refer to Plaintiff as the suspect making it certain that the prosecutor would file charges against Plaintiff. The progress reports are focused on stating that Plaintiff has been "determined" to be the suspect and relaying the information as to only point to Plaintiff. (DR Dkt. 56-3, p. 10, ER-p.52; DR Dkt. 56-3, p. 13, ER-p.55; DR Dkt. 56-3, p. 20, ER-p.62). Portions of the summaries state facts that are not true - such as that Plaintiff's height and weight – although Defendants state such statements were mere re-statements. (DR Dkt. 56-3, p. 15, ER-p.57; DR Dkt. 56-3 p.25, ER-p.67).

The summaries leave out facts including the fact that the Martinez

BMW had a license plate that started with a five while the BMW used in the crime was said to start with a six. (Dkt. 56-4 p. 2ER-p.33). Further, witness identifications that stated that Plaintiff was not the suspect were left out of the summaries. The most reliable witnesses such as Jacquo who was not intoxicated and did not identify Plaintiff was left out of the summary. (DR Dkt. 56-5 p. 2, ER-p.131). Further, the shade of tint in the Martinez BMW was different from the shade of tint of the car that was used in the crime. The summary further repeatedly states that Hamlin viewed Plaintiff run over the victim even without mentioning and despite the fact that Hamlin failed to pick Williams in lineup A.

The tremendous judicial deception caused charges to be filed on July 13, 2010. (DR Dkt. 46-1, p. 14, ER-p.120).

Plaintiff's preliminary hearing was on January 31, 2011. Shortly before the preliminary hearing, Detective Brandstetter made a telephone call to D. Weaver identifying Plaintiff by his name and labeling him as the suspect. (DR Dkt. 56-6 p. 24, ER-p.92).  D. Weaver testified at the preliminary hearing that she thereafter found Plaintiff's identity on online social media websites. (DR Dkt. 56-5 p.6-9, ER-p.135 to 138). D. Weaver likely shared his identify with the rest of the group. Clayton reflects at the preliminary hearing  that Plaintiff matched the "pictures" shown by

Brandstetter. (DR Dkt. 56-5 p. 30, ER-p.105). Witnesses were being conditioned into being Plaintiff was "the man". Plaintiff's preliminary hearing was the third time that he and his identify was labeled as the suspect. Plaintiff was doomed.

On April 21, 2011, Murray requested information that was needed for his "$55,000 bill" from Brandstetter. (DR Dkt. 56-6, p. 19 (Brandstetter depo., ER-p.90). Brandstetter's notes reflect that she refused the request, causing Murray to become irate and to hang up on Brandstetter. Id. This information was not disclosed to Plaintiff and was discovered in the civil action. Id.

On June 2, 2011 Brandstetter showed the two six-packs to Mohammed Alfaour ("Alfaour"), the parking lot attendant on the night of the crime. (DR Dkt. 46-1, p. 15 #82, ER-p.121). Alfour did not pick Williams in line-up A and picked Plaintiff in line-up B. Id. Before viewing lineup B, Alfaour was shown the identity of Plaintiff by way of a youtube.com video showing Plaintiff singing a song. (DR Dkt. 46-1 p. 15 #83, ER-p.121). Defendants attempted to use this witnesses against Plaintiff at trial. Id. The prosecutor refused to call the witness up at trial after learning of the tainted nature of the witness. Id. This information was not disclosed to Plaintiff and was discovered in the civil action.

Before trial, Plaintiff asked his public defender to have the Martinez BMW examined by an expert. The public defender refused and Plaintiff made record of the incident on the record. Plaintiff was sent to trial.

Despite many witnesses not initially picking Plaintiff, a jury convicted Plaintiff on March 5, 2012 after Clayton, Murray, Moore, and Hamlin pointed to Plaintiff at trial. D. Weaver and M. Weaver gave either explicit or implicit approval that Plaintiff was the suspect. (Clayton trial testimony: Dkt. 56-6 p.2, ER-p.079; Moore trial testimony: DR Dkt. 56-6 p.5, ER-p.148). The People's case also substantially relied on linking Plaintiff through the Martinez BMW. (DR Dkt. 56-5, ER-p.146).

On November 2, 2012, the court granted Plaintiff's motion for a new trial on grounds that he was afforded inadequate counsel as well as the fact that expert witnesses on both sides agreed that the Martinez BMW could not have been the one used in the crime as the Martinez BMW had its original driver's side window (Murray's elbow broke the window out to the ground). (DR Dkt. 56-5 p. 14-15, ER-p.143 to p.144).

Brandstetter sent hundreds of letters to potential witnesses. Brandstetter's notes reflect that "approximately 500 calls have been completed with negative results to use in this case". (DR Dkt. 56-5 p. 22-23, 26, ER-p.37-38). On January 2, 2013 the prosecutor stated that the people

were unable to proceed and they dismissed the action as it was apparent that Plaintiff was innocent. (DR Dkt. 56-5, p. 11-12, ER-p.140).

Defendants retained as counsel in this action attorney Mike Feuer who is spouse of the judge in Plaintiff's criminal trial.

For the following illustrations, Plaintiff's constitutional rights were violated.

**PLAINTIFF WAS PROSECUTED AND CHARGED WITHOUT PROBABLE CAUSE THROUGH A COMBINATION OF USING UNRELIABLE IDENTIFICATION PROCEDURES, TAINTING WITNESS RECOLLECTIONS, BY JUDICIALLY DECEIVING PROSECUTORS, AS WELL AS SUBJECTING PLAINTIFF TO PROCEDURES THAT MADE IT ALL BUT INEVITABLE THAT WITNESSES WOULD IDENTIFY PLAINTIFF WHETHER OR NOT HE WAS IN FACT "THE MAN"**

A. <u>A prudent person would not believe there was probable cause to arrest or charge Plaintiff</u>

"A police officer has probable cause to effect an arrest if at the moment the arrest was made the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." <u>Grant v. City of Long Beach</u> 315 F.3d 1081,

1085 (2002) (quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S.Ct. 223, 13

L.Ed.2d 142 (1964). Despite the constitutional requirements of an objective

standard, Brandstetter believes that it is a subjective standard based on her

belief. (DR Dkt. 56-6, ER-p.085 to p.086). Nevertheless, no prudent person

would believe that that there was a fair probability that Plaintiff committed

the crime.

In <u>Grant</u> the suspect was selected in two out of the nine witnesses in

six-pack lineups. <u>Id</u> at 1085. Further, a trained police dog took police to the

suspect's house. <u>Id</u>. Also, Grant resembled physical characteristics of the

suspect. <u>Id.</u> The court held that under those set of facts, there was not

probable cause "at all". <u>Id</u>. As the following facts will illustrate, the amount

of evidence against Plaintiff was even more shoddy.

Detectives' evidence consisted of a statement from Williams that

Plaintiff was a black person that she knew, a traffic ticket that Plaintiff got in

a BMW hard top convertible, a fiber labeled as a "hair" found in that

vehicle, and identifications which were done without any indicia of

reliability and with reckless disregard to general and well known

identification procedures, as fully explained through scientific evidence in

these papers. Further, numerous facts suggested that Plaintiff

was not the criminal including the fact that witnesses identified another

group of perpetrators – nonetheless it was Plaintiff who was charged and prosecuted. (ER-p.197).

Plaintiff's identify was first followed after essentially forcing Jennifer Williams to state a person she knew that was black. Detectives took the name that was forcibly obtained and added fumes of taint by announcing that Plaintiff was the criminal and evidence by way of a "hair" was found, despite the falsity of that statement. It took several months for Defendants to admit and announce that the fiber was not a hair. This was just one element to the tremendous amount of tainting.

Unreliable Lineup and repeated labeling of Plaintiff as the criminal.

The repeated labeling of Plaintiff as the criminal was a violation of due process. In Grant, the court has cautioned that "a major factor contributing to the high incidence of miscarriage of justice has been the degree of suggestion inherent in the manner in which the prosecution presents the suspects to witnesses for pretrial identification." Id. At 1086-1087. (Quoting United States v. Wade 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). It has also warned against presenting "pictures of several persons where the photograph of a single individual recurs or in some way emphasized." Id. At 1086-1087. (Quoting Simmons 390 U.S. at 383, 88 S.Ct. 967). Wade requires that criminal Appellees have "aid of

counsel" at "critical moments" to avoid prejudice and assure a meaningful confrontation at trial. Wade, supra, 388 U.S. 218 at 236-237.

Officers could fortify the identification procedure against possible suggestiveness by showing the victims more than 6 photographs. Grant, supra, 315 F.3d at 1090. See United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994). "Common sense dictates that slight irregularities are more likely to `jump out' ... with only six photographs on it than ... a large mug book containing hundreds of photographs." Id. at 1090. Poor reliability of photos makes their use inexcusable. Manson v. Brathwaite 432 U.S. 98 at 132 (1977).

Here, Plaintiff stood out of the six-pack. Further, Plaintiff was repeatedly identified and singled out as "the man". Plaintiff was already singled out twice before the preliminary hearing – in a line-up and through telephone calls to witnesses before the preliminary hearing – making the preliminary hearing his third exposure as "the man".

Courts have stated that the standard with respect to the admissibility and thus constitutionality of identifications involve factors to determine the indicia of reliability, which are as follows: 1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the

level of certainty demonstrated at the time of confrontation; and 5) and the length of time between the crime and the confrontation. Id. at 114 (1977)). Further, in Grant, supra at 1088, the court stated that identifications are less reliable when other plausible suspects are identified. The court in Manson, supra,432 U.S. at 115-116 suggests that weeks or a months could be too long of time. Further, in Grant, supra, 315 F.3d at 1088 there was a three month gap and the court concluded the identifications inadequate.

There were several substantial problems that led to the false conviction of Plaintiff. Among the gravest offenses committed against Plaintiff was the manner in which investigators conveyed with confidence that Plaintiff had "been identified" as the criminal – a label that stamped doom to Plaintiff's fate. Added to the manner was the fact that the time interval here was approximately one year. With that time interval, memories are not fresh and recollections are more vulnerable to manipulation.

With respect to the officer here who created the six-pack, on October 15, 2014 Small testified at deposition that he did not know if he made the six-pack. (DR Dkt. 56-6, ER-p.129). Then, for the summary judgment motion, Small and Brandstetter testified that he did make the six-pack. (DR Dkt. 46-1, ER-p.115). This is further evidence of bad faith and evidence that Defendants are actively obstructing justice.

17

Here, the opportunity to view the suspect was low because the location of the crime was dark, the suspect had a hat on, and the event happened fast. The degree of attention paid was low because witnesses were intoxicated, excited, and angry. The accuracy of the witnesses' prior descriptions was also low as witnesses were unable to help officers the very next day after the crime with a sketch. The suspect did not match Plaintiff's description as he is not "short, skinny, squinty eyes, narrow nose, and dark complexion". Also, the witnesses were so drunk their alcohol tab was $1,500 and they had alcohol before as well. (DR Dkt.56-6, ER-p.082; DR Dkt.56-6, ER-p.83).

Here, the best witness was likely Jacquo because she was the original person who spoke to the suspect. Jacquo pointed to Williams but not Plaintiff. Furthermore, the witnesses that selected Plaintiff include security officers Hamlin and Murray. Hamlin did not pick Williams when many other witnesses did suggesting that Hamlin's recollection of the perpetrator was poor.  Further, the evidence shows that detectives focused their attention to witnesses who picked multiple people, including statements by Clayton and Moore, who picked multiple people in lineup B suggesting that their recollection was poor.

Failure to conduct blind identification procedure

Procedural due process rules are shaped by the risk inherent in the truth finding process as applied to the generality of cases, not rare exceptions. Mathews v. Eldridge 424 U.S. 319 at 344 (1976). Detectives could have employed safer line-up procedures such as having blind line-ups, which certain jurisdictions proscribe for, in an effort to promote justice, unlike Defendants, who continue to fight for unjust procedures that violate the Due Process Clause of the U.S. Constitution.

Here, Plaintiff was a victim of City's sub-par system of identifying criminals. Plaintiff stands for the position that because un-blind line-ups are scientifically proven to be unfair, the Court should prohibit the utilization of such suggestive procedures. Certain jurisdictions do not employ such methods – perhaps 300 days of Plaintiff's freedom would have been spared and the correct criminal would be behind bars if City followed safety procedures with respect to the identification of criminals.

Should the court decide that an outright ban of said un-blind procedures is outweighed by concerns of efficiency, Plaintiff argues that the use of said lineups under the set of facts in this action was a violation of his due process rights. Further, Plaintiff believes the risks of not prohibiting such procedures has grave societal consequences including causing innocent people to be jailed and criminals to remain uncaught. Plaintiff's story at

this moment given his status as an uncompensated victim is a severe crush to the spirit of the Constitution of the U.S.A.

## There is substantial evidence that Detective Brandstetter conducted judicial deception on district attorneys.

Despite the shoddy case against Plaintiff, Brandstetter essentially sold the prosecutor with respect to the filing of charges against Plaintiff. The standard with respect to the claim that a warrant was proclaimed through judicial deception is whether "… the Appellee deliberately or recklessly made false statements or omissions that were made material to the finding of probable cause. Ewing v. City of Stockton 588 F.3d 1218, par.3 (9th Cir. 2009). Omissions or statements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." Id. Brandstetter's conduct with respect to presenting reports to the prosecutor entailed numerous false statements, twisted facts, harmful assumptions, and omissions of substantial exculpatory information. Such conduct caused charges to be filed on the wrong person which led to Plaintiff being repeatedly singled out to witnesses as "the man" as once charges are filed witnesses received subpoenas to appear at Plaintiff's preliminary hearing. Witnesses testified that they looked Plaintiff up on social media website before the preliminary hearing and Brandstetter admits

to relaying information detrimental to Plaintiff by way of telephone to witnesses before the preliminary hearing. (DR Dkt. 56-6, ER-p.092)

Here, as illustrated above, the six-packs had severe flaws. And even though most people did not pick Plaintiff, the results of the lineup were further distorted to confidently state in the progress reports that Plaintiff had been identified by witnesses as the suspect. Multiple false facts were stated in the summaries including stating that Plaintiff is 5 foot 7 to 5 foot 8 when Plaintiff is 5 foot 11. Also, the summaries state that Plaintiff is 160 pound when he is 205 pounds. In other words, an apple was sold as an orange. Plaintiff is not a "dark skinned" black male. Further, a fiber was incorrectly described as evidence of a "hair" to further taint witness recollections.

In addition, the summaries focus on Murray's identification which was described as a positive identification but Murray stated that Plaintiff was "close". The summaries also failed to state that Plaintiff had multiple alibis and that his cell phone was never linked to the area of the crime. (DR Dkt.56-6, ER-p.091) It also failed to state that the BMW linked to Plaintiff was possibly different in model to that used in the crime as it did not have a sunroof and multiple opinions were stated by witnesses with respect to the model type of car. Further, inspecting the window would have been the next

logical step. The summaries also left out the fact that the shade of tint of the Martinez vehicle was different than the shade of tint found at the scene.

**Plaintiff's right to exculpatory evidence under Brady v. Maryland was violated.**

A criminal Appellee's due process rights are violated "if the government fails to disclose evidence that is materially favorable to the accused. Youngblood v. West Virgina, 547 U.S. 867, 869,126 S. Ct. 2188, 165 L. Ed. 269 (2006) (citing Brady, supra, 373 U.S. 83).

In Strickler, the Court has stated that a claim for the violation of due process exist under Brady v. Maryland if 1. the withheld evidence was favorable either because it was exculpatory or could be used to impeach, 2. the evidence was suppressed by the government, and 3. the nondisclosure prejudiced the Plaintiff. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 l.Ed. 2d 286 (1999).

Here, witness Murray had a very strong monetary motive to point to Plaintiff which was for his "lawyer" and "bills". (ER-p.090). His financial motive was so extreme that he hung up on detectives. This information was not disclosed to Plaintiff and he was thus unable to adequately cross-examine the witness regarding those issues at trial, weakening Plaintiff's criminal defense and contributing to his false arrest. Additional material exculpatory evidence includes evidence that the

Martinez vehicle was not the vehicle in the crime.

**Defendants were aware of Plaintiff's innocence many days before actually exonerated.**

The case of US v. Ortiz-Hernandez 427 F.3d 567 at 574 (9th Cir.) states that one is to be released if facts arise which would dissipate probable cause. Here, it became apparent to Defendants through their own experts that the Martinez BMW could not have been used in the crime on date. (Dkt. 56-5 p. 14, ER-p.143-143). Nevertheless, Appellees ruthlessly continued to incarcerate Plaintiff until January 2, 2013 when he was released after the holidays. (Dkt. 56-5,p. 11- 12, ER-p.140-141).

**Plaintiff was maliciously prosecuted by Defendants.**

According to Awabdy, supra, 368 at 1066, the standard with respect to a malicious prosecution claim under section 1983 is whether Defendants prosecuted Plaintiff with malice, without probable cause and for the purpose of denying Plaintiff equal protection or another specific constitutional right.

Here, a substantial amount of evidence illustrates that Detectives acted without probable cause and with malice for the purpose of denying Plaintiff numerous constitutional protections.

As illustrated above, Plaintiff was prosecuted without probable cause and was subject to a procedure in totality that would make it all but inevitable for

witnesses to identify him at trial, a blatant violation of Plaintiff's right to due process, among other violations stated.

**Defendants deliberately fabricated evidence against Plaintiff.**

In <u>Devereaux v. Abbey</u>, 263 F.3d 1070 (9th Cir. 2001) (en banc), the Ninth Circuit held that "there is a clearly established constitutional due process right not be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." <u>Id.</u> At 1074-75. The court in <u>Gantt v. City of Los Angeles</u>, 717 F.3d 702, 707 (9th Cir. 2013), held that in order to establish deliberate fabrication of evidence, Plaintiff must, *at a minimum,* point to evidence that supports at least one of the following two propositions: (1) Appellees continued their investigation of the person despite the fact that they knew or should have known that he was innocent; or (2) Appellees used investigative techniques that were so coercive and abusive that they knew or should have known those techniques would yield false information. Here, the evidence supports both propositions.

Facts include the fact that none of Plaintiff's physical characteristics matched that of the suspect, the vehicle did not match and it was apparently so, the identifications were not a match despite their unduly suggestiveness

24

and only served to further taint witness recollections. Furthermore,

detectives were so coercive and abuse that the detectives knew or

should have known that those techniques would yield false information.

Those techniques include prosecuting Plaintiff based on coercive tactics

such as asking other suspects to "stop playing games" and to state who she

"knows" that is black in order for Williams to give up a name - a name

whose identity would later be repeatedly singled out as "the man".

Furthermore, the un-blind lineups conducted against Plaintiff

contained suggestive elements, contributing to the injustice that Defendants

have wrought upon not just Plaintiff but society as whole.

## City is liable under Monell

The first inquiry with respect to §1983 municipal liability is whether

there is a direct causal link between the policy or custom and the alleged

constitutional deprivation. City of Canton v. Harris 489 U.S. 378, 385

(1989). Here, Plaintiff's deprivation of liberty without due process was a

result of many unconstitutional policies and customs.

Further, City fails to adequately train officers with respect to what

constitutes probable cause as illustrated by the fact that Brandstetter stated

the wrong standard as she believes it is a subjective standard with respect to

probable cause and Plaintiff is a victim of this failure to train. (DR Dkt. 56-

6, ER-p.85).

Also, City fails to train its officers and prosecutors with respect to when exculpatory information is to be handed to the defense including valuable impeachment evidence for Murray, among other information stated in these papers.

Additionally, City fails to train its officers to abide by due process requirements. For example, in <u>Foster</u> the Supreme Court held that it is a violation of due process to repeatedly single out a person as a suspect to witnesses. <u>Foster v. California</u>, 394 U.S. 440 at 443, 89 S. Ct. 1127, 22 L. Ed. 2d 402. Nevertheless, Defendants clearly violated this rule here. City additionally fails to train its officers to neutrally provide all information to prosecutors and instead encourages convictions without appreciating the value of accurate convictions. Furthermore, Defendants turns a complete and stubborn blind eye to the fact that it's subpoenas contain the identity of suspects and in doing so contribute to the suggestive elements that make it all but inevitable that witnesses would identify Plaintiff whether or not he was in fact "the man".

With respect to the lineup that was done un-blindly, City still risks the lives of the people. Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of

life, liberty, or property. <u>Carey v. Piphus</u> 435 U.S. 247, 259, 98 S. Ct. 1042, 55 L. Ed. 2d 252. Further, "procedural due process rules are shaped by the risk of error inherent in the truth-finding process. <u>Id.</u> at 259. Despite the fact that un-blind lineup contributed to the injustice against Plaintiff, Defendant continues to employ the procedure in conscious disregard to the liberty of its inhabitants. In fact, City eerily encourages its officers in writing to utilize such unlawful procedures states that they should bring "more convictions". (DR Dkt. 56-3, ER-p.048). For one, despite scientific evidence illustrated here that proves that lineups not conducted blindly are dangerously and unduly suggestive, and despite the fact that conducting lineups in such manner are outlawed in several jurisdictions. City does not require blind lineups in reckless disregard for the liberty of its' inhabitants.

Municipal corporations are not protected in 1983 suits by the immunities of their employees. <u>Owen v. City of Independence</u> 445 U.S. 622, 653 (1980), 100 S. Ct. 1398, 63 L. Ed. 2d 673.

A further substantial inadequate policy on behalf of City of Los Angeles is providing adequate counsel to criminal Appellees. The right to counsel is an established constitutional right when counsel is needed for a meaningful defense. <u>United States v. Wade</u> 388 U.S. 218 at 25(1967) Here, Plaintiff was afforded inadequate counsel by City. His motion for new

trial was granted on that basis which is per se proof of the inadequacy provided. Further, Defendants should not be able to defend themselves in theory and at trial on grounds that the public defender committed malpractice or contributed to Plaintiff's woes as the public defender was an employee of City itself. Therefore, Defendants should be waived and estopped from blaming the public defender for Plaintiffs woes in any way. Further, the fact that City of Los Angeles compensates prosecutors more that public defenders is further proof of a policy and custom of providing inadequate counsel.

## **Defendants violated the Equal Protection Clause.**

The Equal protection Clause of the Fourteenth Amendment provides that "no State shall … deny to any person within its jurisdiction equal protection of its laws." U.S. CONST. amend.XIV, §1. For an Equal Protection claim, the standard with respect to liability is if the officer "acted in a discriminatory manner and that the discrimination was intentional." Fed. Deposit Ins. Corp. v. Henderson 940 F.2d 465, 471 (9th Cir. 1991).

Plaintiff's position is that in totality there were different and unconstitutional standards afforded to him because he is a black American. The intent to deny him of constitutional rights is apparent and it is further apparent that a different standard was applied to Plaintiff. A reasonable trier

of fact could conclude that the standard afforded to Plaintiff was motivated by the fact that Plaintiff was black and were motivated by depriving Plaintiff of his constitutional rights. Plaintiff argues his rights would not have been violated in such a manner if he was not black.

**Defendants conspired to violated Plaintiff's consititutional rights, either directly or indirectly in violation of Equal Protection under 42 U.S.C. §1985 (3).**

To establish a section 1985(3) claim, one must prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. Sever v. Alaska Pulp Corp., 978 F.2d 1529, 536 (9th Cir. 1992) (citations omitted). In the Ninth Circuit, the Plaintiffmust allege class based animus. Bretz v. Kelman, 773 F.2d 1026, 1029 (9th Cir. 1985).

Here, numerous City agents conspired to deprive Plaintiff of numerous constitutional rights, as outline above. Further City has defended its position in the past by arguing that the filing of charges by the prosecutor would cut off liability. As explained above, there was a tremendous amount

of judicial deception perpetrated on the filing prosecutor which caused Plaintiff to be falsely charged and identified as the criminal. This argument fails because Appellees' position, if true, means that Appellees conspired with prosecutors who are also City agents to deprive Plaintiff of his constitutional rights.

Additionally, City also suggests that the investigators who inspected the Martinez BMW are not listed Defendants and therefore the detectives are not liable for their conduct. This argument also fails because the other investigators are also City employees who conspired with the named investigators to fabricate evidence and hide exculpatory evidence. For such reasons and the threat of potential third party tortfeasor from being pointed to at trial, P argues for this claim as it will be necessary to have a fair civil trial.

**Plaintiff's right to liberty was deprived without due process of law.**

Even if the violations Plaintiff alleges do not amount to a constitutional violation, in totality, Plaintiff's right to due process was violated. In Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402, a witness could not positively identify the individual in a 3 person lineup – he thought he was the man but was not sure. Id at 441. They then

arranged a one on one. Id. Then police arranged the 3rd lineup in which there were 5 men – this time the witness who "thought" it was him were not "convinced" it was him. Id. The only other evidence was that an accomplice, Clay who turned himself in, charged him with committing the robbery. The Supreme Court held that judged by "totality of circumstances", the conduct of identification procedures may be "so unnecessarily suggestive and conductive to irreparable mistaken identification" as to be a denial of due process of law. Id. at 442 (citing Simmons v United States 390 U.S. 377, 383 (1968)). The court held in Foster that repeatedly telling the witness that "this is the man" so undermined the reliability of the eyewitness as to violate due process. Id. at 443.

In Baker v. McCollan 443 US 137, 147, 99 S. Ct. 2689, 61 L. Ed. 2d 433, the court states that that cases upon occasion have defined "liberty" without specific guidance from the Bill of Rights. For example, it has found police conduct that "shocks the conscience" to be a denial of due process. Id. at 147.

The long list of constitutional violations - including the administration of lineups un-blindly, repeated suggestive elements making misidentifications inevitable, the lack of action with respect to releasing Plaintiff, and the withholding of valuable exculpatory information, among

other things - as a whole shock the conscious. It should be no surprise that

detectives here imprisoned the wrong person and had to tell injured victims

to hire a private investigator. The seeds of the many unconstitutional acts

ripened resulting in the incarceration of an innocent man while a criminal

remained untouched. Therefore, even if each violation does not

sum up to the cause of Plaintiff's woes, in totality, the record establishes

that his right to due process was violated and does shock the conscious.

### Qualified immunity does not apply to Detectives

The ninth circuit held in <u>Grant, supra,</u> at 1089 that the two part Saucier

test applies to qualified immunity. The <u>first question</u> is whether the facts,

when taken in the light most favorable to the victim of the unconstitutional

conduct, show that the officers' conduct violated a constitutional right. <u>Id.</u>

Courts have long held that the Fourth Amendment requires probable

cause before an officer may arrest an individual. <u>Id</u>. (citing <u>Beck v. Ohio</u>,

379 U.S. 89, 91 (citations omitted). Furthermore, as illustrated, Plaintiff's

right to due process under the 4th, 5th, and 14th Amendments was violated for

numerous reasons.

The <u>second question</u> is whether the constitutional right at issue is

"clearly established." <u>Id</u>. Here, the "relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." <u>Id</u>. Qualified immunity is an objective inquiry and whether the

officers subjectively believed that they had probable cause to arrest the victim of constitutional deprivations is irrelevant. Id. (citing Anderson v. Creighton 483 U.S. 635, 641). To prevail on qualified immunity, the detectives must show that as a matter of law that a reasonable officer would have arrested Plaintiff based on the evidence against Plaintiff. Id.

Furthermore, in Malley v. Briggs 475 U.S. 335 at 346 (1986) the court held that officers applying for a warrant are required to minimize the danger of unlawful arrest by exercising professional judgment. Furthermore, when foundational facts regarding a qualified immunity claim remain in dispute, these facts must be decided by the jury. Peirce v. Multnomah County, Oregon 76 F.3d 1032, 1038-39 (9th Cir. 1996). Therefore, Plaintiff deserves his day in court against Defendants with respect to the violation of Plaintiff's rights.

**Defendant's favorable termination requirement defense fails because Plaintiff proved his innocence**

Appellees have argued that Awabdy, supra, 368 at 1066 stands for the proposition that a malicious prosecution actions must generally establish that there was a termination of the underlying proceedings in such as a manner as to indicate his innocence. The theory in Awabdy stems from the decision in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383. In Heck, the issue was whether a prisoner could challenge the constitutionality of his conviction through a section 1983 damages suit after he exhausted his federal habeas corpus remedy. In Heck the court held that 1983 suits are not

the vehicle for challenging outstanding criminal judgments. Id. at 486. The court further states that if the district court determines that the Plaintiff's action, even if successful, will not demonstrated the invalidity of an outstanding criminal judgment against the Plaintiff, the action should be allowed to proceed. Id. at 487.

Additionally, in Nonnette v. Small, 316 F.3d 872, 875 (9th Cir. 2002), the Ninth Circuit held that Heck did not bar a section 1983 claim by a prisoner on parole who is no longer in custody, even if the claim might call into question the basis of the prior criminal conviction. Additionally, there is a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court. Allen v. McCurry 445 U.S. 90, 103, 101 S.Ct. 411, 66 L.Ed. 308.

Here, Plainitiff has been exonerated by way of the City finally admitting that there is no basis for prosecuting Plaintiff. Additionally, evidence of this fact is apparent by the fact that City could have in theory taken the case to trial again after the motion for new trial was granted. Furthermore, District Judge Kroenstadt in this matter also agrees that Plaintiff proved his innocence in the criminal matter. (DR Dkt. 91, ER-p.023, par.3).

**Granting of Summary Judgment Should be Reversed as Plaintiff has the right to have the matter judged by his peers.**

Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. Bivens v. Six Unknown Fed. Narcotics Agents, 403, US 388, 389 (1971) (citing Wiley v. Sinkler 179 U.S. 58 (1900)). "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 1 Cranch 137, 163 (1803). Chief Harlan has stated that damages may be entirely appropriate even when no future deterrent effect may occur. Further, Plaintiff has a right to sue for his invaded rights in order to "make good the wrong done." Bell v. Hood 327 U.S. 678 at 685 (1946).

The threshold summary judgment question is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. Billington v. Smith, 292 F. 3d 1177 (9th Cir. 2002). Here, an array of Plaintiff's constitutional rights have been violated, as illustrated above.

On summary judgment the respondent is entitled to have the evidence evaluated and reasonable inferences drawn in his favor. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255, 107 S. Ct. 3034, 97 L. Ed. 2d 523.

In fact, detectives are liable for punitive damages as well based on the court's opinion in Barr v. Matteo 360 US 564 (1959), quoting Judge Learned Hand holding that "There must indeed be means of punishing public

officers who have been truant to their duties …". Furthermore, in <u>Under Act Up/Portland v. Bagley</u>, 988 F.2d, 868, 873 (9th Cir. 1993), "If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." In addition, under <u>Llaguno v. Mingey</u> 763 F.2d 1560, in a damages suit, whether there was probable cause is a question for the jury.

## JURY INSTRUCTIONS

Should the court allow Plaintiff a trial, Plaintiff seeks an advisory opinion from the Court regarding prospective jury instructions. Note is being made that Plaintiff and Defendant maintained significant disagreements with respect to prospective jury instructions. For one, Plaintiff believes that jury instructions should be based on constitutional standards as such standards are the interpretation of constitution. Further, Plaintiff believes it should have the option to have as jury instructions the well established tort principle that professional malpractice does not cut off liability. <u>Velsey v. Sager</u> 5 Cal.3d 153, 163. (1971); <u>Anaya v. Superior Court</u> 93 Cal. Rprt. 2d 228.

Here, this instruction would prevent Defendants from arguing that his woes were caused by inadequate counsel.

## CONCLUSION

For the stated reasons, Plaintiff requests that he be able to have a jury trial in order to decide the issue of fact of whether Plaintiff's constitutional rights were violated.

DATED: January 18, 2016      RESPECTFULLY SUBMITTED,

/s Matthew Rabban

 Matthew Rabban

ATTORNEY FOR PLAINTIFF

Riolordo Plaintiff

**CERTIFICATE OF COMPLIANCE**

Pursuant to rule 8.204(c) of the California Rules of Court, I hereby certify that this brief contains 9,018 words, including footnotes. In making this certification, I have relied on the word count of the computer program used to prepare the brief.

DATED: January 18, 2016                    RESPECTFULLY SUBMITTED,


/s Matthew Rabban


 Matthew Rabban

ATTORNEY FOR PLAINTIFF

RIOLORDO PLAINTIFF

## STATEMENT OF RELATED CASES

Plaintiff's attorney Matthew Rabban hereby declares under penalty of perjury that he is unaware of any other active cases that would affect the outcome of this matter.

DATED: January 18, 2016          RESPECTFULLY SUBMITTED,


/s Matthew Rabban


 Matthew Rabban

ATTORNEY FOR PLAINTIFF

RIOLORDO PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2015, I electronically filed Plaintiff's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF System to the following CM/ECF registrants:

Wendy Shapero

Office of City Attorney

200 Main Street 6th Floor

Los Angeles, CA 90012

DATED: January 18, 2016             RESPECTFULLY SUBMITTED,

/s Matthew Rabban

 Matthew Rabban

ATTORNEY FOR PLAINTIFF

RIOLORDO PLAINTIFF